IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

DAVID M. SELF                                                                                                  PLAINTIFF

      v.                                    CIVIL NO. 5:17-CV-5261

NANCY A. BERRYHILL, [1] Acting Commissioner,
Social Security Administration                                                                    DEFENDANT

## **MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, David M. Self, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claims for a period of disability and disability insurance benefits (DIB) and supplemental security income (SSI) under the provisions of Titles II and XVI of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

**I.        Procedural Background:**

Plaintiff protectively filed his current applications for DIB and SSI on October 22, 2015, alleging an inability to work since July 3, 2014, due to neck problems, including surgery; carpal tunnel in his left hand; enlarged prostate; numbness in his arms, hands and feet; a cyst on his left wrist; a pinched nerve that impacts both arms and both feet; and a spot on his left lung. (Tr. 203-204, 214-215, 227-228, 239-240). For DIB purposes, Plaintiff maintained

---

[1] Nancy A. Berryhill, has been appointed to serve as acting Commissioner of Social Security, and is substituted as Defendant, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

insured status through December 31, 2019. (Tr. 203, 214, 227, 239). An administrative hearing was held on September 1, 2016, at which Plaintiff appeared and testified. (Tr. 172-200). Plaintiff's counsel was present, and Barbara Hubbard (VE), was also present and testified. (Tr. 172-200).

In a written opinion dated November 23, 2016, the ALJ found that the Plaintiff had a severe impairment of residuals of injuries received in a four-wheeler accident and herniated nucleus pulposus at C3-4, C4-5, and C5-6 status post laminectomy and fusion. (Tr. 97). However, after reviewing the evidence in its entirety, the ALJ determined that the Plaintiff's impairments did not meet or equal the level of severity of any listed impairments described in Appendix 1 of the Regulations (20 CFR, Subpart P, Appendix 1). (Tr. 97-98). The ALJ found Plaintiff retained the residual functional capacity (RFC) to perform light work, except that he was limited to occasional overhead reaching with his non-dominant hand. (Tr. 98-104). With the help of VE testimony, the ALJ determined that Plaintiff was unable to perform his past relevant work as a welding machine tender and pipefitter. (Tr. 104). However, based on the Plaintiff's age, education, work experience, and RFC, the ALJ determined that there were jobs that existed in significant numbers in the national economy that the Plaintiff could perform, such as a cashier, a marking clerk, and a routing clerk. (Tr. 105). Ultimately, the ALJ concluded that the Plaintiff had not been under a disability within the meaning of the Social Security Act from July 3, 2014, through the date of the decision. (Tr. 105).

Plaintiff then requested review of the hearing decision by the Appeals Council, which after reviewing additional evidence submitted by Plaintiff, denied that request on October 18,

2017.[2] (Tr. 1-7). Plaintiff filed a Petition for Judicial Review of the matter on December 18, 2017. (Doc. 1). Both parties have submitted briefs, and this case is before the undersigned for report and recommendation. (Docs. 12, 13).

The Court has reviewed the transcript in its entirety. The complete set of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

## II.   Evidence Submitted:

At the hearing before the ALJ on September 1, 2016, Plaintiff testified that was born in 1963, and his past relevant work consisted of work as a welding machine tender, a material cutter, and a pipefitter. (Tr. 104, 177, 198).

Prior to the relevant time period, Plaintiff was treated generally for right ear pain, hearing issues, a cyst of his earlobe, right hip pain, a groin abscess, and gastroenteritis. (Tr. 460, 463, 466, 468-469). Also prior to the relevant time period, in April 2014, Plaintiff was treated in the emergency room immediately following an All-Terrain Vehicle accident and then at Boston Mountain Rural Health Center for complications from that accident. (Tr. 457). Six weeks following the accident on June 3, 2014, Plaintiff's cervical spine x-ray showed moderate chronic degenerative disc disease and spondylosis at C5-6 without significant change; interval development of mild degenerative disc disease; and minimal spurring at C4-5. (Tr. 472). On June 6, 2014, Plaintiff visited Boston Mountain Rural Health Center for

---

[2] With respect to the additional evidence from the relevant time period that was submitted to the Appeals Council, the Appeals Council made the following determination, "We find this evidence does not show a reasonable probability that it would change the outcome of the decision. We did not consider and exhibit this evidence." The Court notes that, here, as the Court found in Benoit v. Berryhill, although the Appeals Council denied Plaintiff's request for review and indicated that it did not consider or exhibit the evidence, the Appeals Council's decision reflects that the Appeals Council received the additional records; that it reviewed these records; and that it concluded that these records did not provide a basis for changing the decision of the ALJ. Benoit v. Berryhill, 2018 WL 4554519, at *7 (E.D. Mo. September 21, 2018).

follow-up after his ATV accident. (Tr. 454). He was assessed with cervical pain, bilateral shoulder pain, and left wrist pain. (Tr. 455). Plaintiff refused a MRI of his cervical spine, and x-rays of his shoulders and left wrist were negative. (Tr. 454-456).

A review of the medical evidence reflects that one year after the relevant time period began, Plaintiff was seen at Boston Mountain Rural Health Center on June 2, 2015, for complaints of not sleeping well, pain in his left wrist from his accident the previous year, and bumps on his head. (Tr. 451). Upon examination, his gait was steady, he had no edema, and he had normal sensation and strength. (Tr. 452). Plaintiff was assessed with sleep disturbance, erectile dysfunction, and chronic pain. (Tr. 453). Gina Dickey, APRN, noted that Plaintiff's medications were adjusted. (Tr. 453).

On June 15, 2015, Plaintiff saw Dr. Noel Henley at Ozark Orthopaedics for left wrist pain. (Tr. 482). Clinic notes indicated that the pain was from his ATV accident in 2014. (Tr. 482). Clinic notes also indicated that Plaintiff had so many complaints that "[i]t was almost impossible" to narrow them down. (Tr. 482). Dr. Henley noted that the four views of the left wrist that day revealed no fracture, dislocation, or other abnormality or sign of acute injury. (Tr. 482). He was diagnosed with possible carpal tunnel syndrome. Dr. Henley instructed Plaintiff to wear a splint on the wrist and to undergo nerve testing. (Tr. 483).

On June 22, 2015, Plaintiff underwent an electrodiagnostic testing by Dr. Miles Johnson for his neck and left upper extremity pain, numbness, tingling and weakness. (Tr. 490). Dr. Johnson's notes indicated that plaintiff was a smoker. (Tr. 491). The testing was consistent with a diagnosis of cervical radiculopathy at C6 and/or C7 (left); mild left median neuropathy at the level of the wrist consistent with a diagnosis of carpal tunnel syndrome; and

history and physical examination was also suggestive of possible cervical myelopathy. (Tr. 491). Dr. Johnson recommended a MRI of the cervical spine to further evaluate the neck pain. (Tr. 492).

On July 15, 2015, Plaintiff had a MRI of his cervical spine, which showed extensive multilevel cervical spondylosis, worse at the C3-4, C4-5, C5-6 levels with moderate canal stenosis at these levels and moderate to severe bilateral foraminal stenosis. (Tr. 488). It also showed T2 hyperintensity within the cord at the C4-5 and C5-6 levels compatible with edema or gliosis. (Tr. 488).

On July 23, 2015, Plaintiff saw Dr. John Barr with complaints of arm contractures and hand weakness, greater on the left than the right, worsening gait and balance, burning pain over entire left arm, and difficulty holding his left arm straight especially with intended motion. (Tr. 546). Dr. Barr recommended a three-level anterior cervical discectomy and fusion procedure (ACDF) and emphasized smoking cessation for successful bone fusion. (Tr. 547).

On August 6, 2015, Plaintiff saw Dr. Barr, who determined that based on Plaintiff's severe stenosis at C4-5 and moderate to severe at C3-4, Plaintiff should undergo ACDF for direct decompression of the cervical cord. (Tr. 150, 525). Plaintiff was admitted to Washington Regional Medical Center for an ACDF procedure at C3 through C6. (Tr. 147, 522). A MRI on that date showed C3 through C6 anterior cervical fusion with good anatomic alignment and hardware intact. (Tr. 151, 529). Plaintiff's chest x-ray was also normal. (Tr. 155, 533). Plaintiff was admitted to Washington Regional Medical Center after his evaluation and underwent a C3-4, C4-5 and C5-6 ACDF procedure. (Tr. 523, 526). Upon discharge from

5

Washington Regional Medical Center on August 6, 2015, Plaintiff was instructed to do light work with no heavy lifting or straining and to wear his cervical collar at all times. (Tr. 522).

On August 27, 2015, Dr. John Barr completed a Medical Source Statement, wherein he opined that Plaintiff could: frequently lift and/or carry less than ten pounds; occasionally lift and/or carry less than ten pounds; stand and/or walk a total of four to six hours; sit a total of eight hours; limited pushing and/or pulling in upper and lower extremities; five or more breaks in an eight-hour day; avoidance of exposure to extreme heat, wetness, fumes, odors, dusts, gases, poor ventilation, and hazards; and avoidance of concentrated exposure to humidity. (Tr. 499-501). Plaintiff also had an office visit with Dr. Barr that day and Dr. Barr noted that Plaintiff's left arm was no longer in the flexed position and had improved range of motion; he had improved strength; he had continued numbness but his dysphagia was resolving; he denied significant neck pain; and he was healing well. (Tr. 544).

On September 30, 2015, an x-ray of Plaintiff's cervical spine showed cervical spine fixation from C3 through C6 anteriorly with plate and screws, and no hardware loosening or fracture. (Tr. 156, 521).

On October 1, 2015, Plaintiff saw Dr. Barr for his first post-operative evaluation. Dr. Barr noted that Plaintiff had improved and was fully functioning up until two weeks prior when he was engaged in heavy lifting, which caused a setback with muscle aches and pains in his biceps. (Tr. 541). Dr. Barr ordered an additional MRI of the cervical spine and instructed him to refrain from heavy lifting. (Tr. 543).

An October 9, 2015, MRI of the cervical spine showed interval ACDF of C3-6 with improved caliber of the spinal canal at these levels, particularly at the C4-5 and C5-6 levels;

stable moderate to severe foraminal narrowing at C5-6 level; and stable T2 hyperintensity within the cord at the C4-5 andC5-6 levels compatible with gliosis. (Tr. 551).

On November 10, 2015, an x-ray of Plaintiff's cervical spine showed a stable cervical spine with redemonstrations of anterior cervical disc fusion of C3 through C6 with hardware intact and stable alignment. (Tr. 520). Plaintiff also saw Dr. Barr that day, who reported that since Plaintiff's neck procedure, his strength and sensation had improved; his dysphagia had improved; he was wearing his collar as instructed; his wound was healing well; and his arm, which had previously been in a flexed position, had also improved. (Tr. 538). Dr. Barr recommended physical therapy on Plaintiff's cervical spine and strongly cautioned him on smoking cessation to improve his chances of fusion. (Tr. 539).

On December 1, 2015, Plaintiff underwent a physical therapy evaluation. Daniel Warren, therapist, determined that Plaintiff would benefit from physical therapy to address impairments and restore maximum function. (Tr. 558). Plaintiff also had physical therapy sessions on December 8, 2015, December 15, 2015, and December 22, 2015. (Tr. 560, 569).

On December 10, 2015, Dr. Ben Johnson, a non-examining medical consultant, performed a Physical RFC Assessment, where he determined that Plaintiff was capable of light work with overhead reaching restrictions as of August 5, 2015. (Tr. 210, 222).

Plaintiff had additional physical therapy sessions on January 5, 2016, January 7, 2016, January 26, 2016, January 28, 2016, February 2, 2016, February 16, 2016, and February 23, 2016. (Tr. 570, 571)

On January 13, 2016, Dr. Rita Albright, a non-examining medical consultant, performed a Physical RFC Assessment, where she affirmed Dr. Johnson's assessment of light work with overhead reaching restrictions. (Tr. 236, 248).

On January 19, 2016, Plaintiff was seen at the Boston Mountain Regional Health Center by Dr. Danny Proffitt for x-rays of his left arm and knees, a knot in his left arm, and knee pain. (Tr. 577). He was assessed with bilateral knee pain and pain in his forearm and given medication. Dr. Proffitt also injected both of Plaintiff's knees. (Tr. 578). An x-ray of Plaintiff's right and left knees were normal. (Tr. 583, 584). An x-ray of Plaintiff's left humerus was also normal. (Tr. 585).

On June 27, 2016, Plaintiff was seen at the Boston Mountain Regional Health Center by Louis Mire, MA, where he was assessed with allergic bronchitis and given medication. (Tr. 575). A chest x-ray performed that day showed mild central bronchial wall thickening which may be seen with infectious or inflammatory bronchitis if clinically relevant, and no gross consolidation or edema. (Tr. 581).

On August 15, 2016, Dr. Barr completed a Physical Exertion Limitations Form describing Plaintiff's physical limitations to be that of light work. (Tr. 589). Dr. Barr also completed a Physical Medical Source Statement on that day indicating that Plaintiff could frequently lift and/or carry twenty-five pounds; occasionally lift and/or carry twenty-five pounds; stand and/or walk and sit as tolerated; and limited pushing and pulling in upper extremities. Dr. Barr did not provide for any further limitations. (Tr. 590-592). In a Physical RFC Assessment form, Dr. Barr indicated that Plaintiff had significant limitations in his ability to reach/push/pull bilaterally in the upper extremities. (Tr. 593).

The following medical records were submitted to the Appeals Council after the ALJ had issued a decision. The Appeals Council reviewed this medical evidence before denying review. On February 19, 2016, an x-ray of Plaintiff's cervical spine showed stable cervical spine fusion with anterior plate and screw fixation from C3-C6. (Tr. 158).

On August 15, 2016, an x-ray of Plaintiff's cervical spine showed "stable anterior cervical fusion." (Tr. 31). Plaintiff also saw Dr. Barr that day. (Tr. 33). Dr. Barr's clinic notes indicated that Plaintiff was there for a follow up from his C3-C6 ACDF for myelopathy. His notes also indicated that preoperatively, Plaintiff had profound left arm pain from a four-wheeler accident. Plaintiff continued to have some left arm weakness and inability to open it fully, as well as neck pain. (Tr. 33). Plaintiff also complained of headaches. (Tr. 34). Plaintiff was assessed with tobacco use, headaches, and cervical disc disorder with myelopathy. (Tr. 34).

On August 25, 2016, Dr. Noel Henley authored a letter explaining that Plaintiff still complained of symptoms of numbness from his shoulder to his fingertips on both upper extremities and flexing at his left wrist. (Tr. 163). Dr. Henley also wrote that after examining Plaintiff, he did not have anything to offer Plaintiff as treatment for his extremity issues. (Tr. 163).

On September 12, 2016, Plaintiff underwent a CT of his cervical spine that showed postsurgical changes of anterior cervical discectomy and fusion procedure from C3-C6, and persistent central canal stenosis and neural foraminal narrowing at C5-C6 and left-sided exit neural foraminal narrowing at C4-C5. (Tr. 28).

On September 16, 2016, Plaintiff was seen by Dr. Chuck Nalley at Ozark Orthopaedics for a second opinion of neck and bilateral upper extremity pain and numbness. (Tr. 114-115).

9

Dr. Nalley assessed Plaintiff with cervical radiculopathy and status post anterior cervical fusion C3-6. Dr. Nalley ordered a MRI of Plaintiff's cervical spine and instructed him to undergo nerve root blocks before any additional surgical options were discussed. (Tr. 115).

On October 21, 2016, Plaintiff underwent a MRI of his cervical spine, which revealed multilevel ACDF, and approximately 3 cm segment of signal abnormality within the cord which may represent sequels of old trauma or myelomalacia; no syrinx, cord enhancement, or cord swelling identified; broad-based disc bulges at C4-5 through C6-7 minimally or mildly fallen the thecal sac; and mild or moderate foraminal narrowing at C4-5 and C5-6 respectively. (Tr. 111-112).

On October 24, 2016, Plaintiff saw Dr. Barr for a follow. (Tr. 24). Plaintiff reported that he was experiencing pain with motion and feeling an audible pop when turning his head, along with persistent arm weakness and pain. (Tr. 24). Overall, his neck pain had worsened and the strength in his left arm had not improved. (Tr. 24). A CT of Plaintiff's cervical spine showed postsurgical changes of anterior cervical discectomy and fusion procedure from C3-C6, persistent central canal stenosis and neural foraminal narrowing at C5-C6, and left-sided exit neural foraminal narrowing at C4-C5. (Tr. 25). Plaintiff was assessed with cervical disc disorder with myelopathy, neck pain, pseudoarthrosis of cervical spine, and tobacco use. (Tr. 26). Dr. Barr recommended a posterior cervical revision fusion with iliac bone marrow aspirate at C3-C6, a C5-C6 laminectomy and foraminotomy for residual bony foraminal stenosis. (Tr. 26). Plaintiff was counseled on smoking cessation and the how it correlates with non-union of bone grafts. Dr. Barr also recommended a bone stimulator post-operatively and external orthoses to maximize the chance of fusion. (Tr. 26).

**III.     Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(C). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. See 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his RFC. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520, 416.920.

**IV.  Discussion:**

Plaintiff presents the following arguments: 1) that the ALJ erred in his RFC determination of light work with limitations, and 2) that the ALJ erred in his Step Five determination by not presenting a valid hypothetical to the vocational expert. (Doc. 12, pp. 2-11).

### A.  Subjective Complaints and Credibility Analysis:

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence

fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors. (Tr. 480). Plaintiff testified that while he experienced numbness in his shoulders and fingertips, numbness in his feet causing him to fall, and no use of his left arm or hand, he stated that he walked around the yard and drove ten miles into town daily. (Tr. 182-185). In Plaintiff's Function Report dated November 12, 2015, Plaintiff reported that he had no problems with personal care except that he could not button his shirts and could not wash his back. (Tr. 372). He also reported that he could drive a car, go out alone, shop in stores for food, and manage his own finances. (Tr. 372). He had no problems getting along with family, friends, or authority figures. (Tr. 377). He reported he could walk 100 yards and finish what he started. (Tr. 376).

With respect to Plaintiff's alleged impairments, the record demonstrates that Plaintiff was treated conservatively for his neck pain (post anterior cervical discectomy and fusion procedure from C3-C6) and his issues with his left arm. Moreover, the record demonstrated that on many occasions, Plaintiff's treatment improved his symptoms. Impairments that can be controlled with treatment or medication are not disabling. See Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (holding that an impairment controllable with treatment or medication is not considered disabling).

Plaintiff's medical providers also repeatedly recommended that Plaintiff stop smoking in order to improve his chances of success with his fusion procedure, and despite these recommendations, Plaintiff continued to smoke throughout the relevant time period. See Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) (noting that a failure to follow prescribed treatment may be grounds for denying an application for benefits). The Court also notes that at Plaintiff's first post-operative evaluation on October 1, 2015, Dr. Barr's notes indicated that while Plaintiff had recovered well, Plaintiff also reported a setback that had occurred as a result of heavy lifting, which was against medical advice. (Tr. 541-543).

Although it is clear that Plaintiff suffers some degree of limitation, he has not established that he is unable to engage in any gainful activity. Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

**D.     ALJ's RFC Determination:**

RFC is the most a person can do despite that person's limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the

workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In finding Plaintiff able to perform light work with occasional overhead reaching with his non-dominant hand, the ALJ considered Plaintiff's subjective complaints, the medical records of his treating and examining physicians, and the evaluations of the non-examining medical providers. Plaintiff's capacity to perform this level of work is supported by the fact that Plaintiff was treated conservatively for his back condition, post-surgery, as well as for his arm pain. See Robinson v. Sullivan, 956 F.2d 836, 840 (8th Cir. 1992) (course of conservative treatment contradicted claims of disabling pain).

Plaintiff appears to allege a closed period of disability from July 3, 2014, to August 27, 2015. A review of the medical record shows that Plaintiff sought no medical treatment from June 6, 2014, to June 2, 2015. See Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (a claimant's subjective allegations may be discredited by evidence they have received minimal medical treatment and/or has taken only occasional pain medications). Moreover, Dr. Barr's Medical Source Statement from August 27, 2015, which was approximately three weeks post-surgery, and his second Medical Source Statement from August 15, 2016, showed improvement of Plaintiff's condition and indicated Plaintiff was capable of light work with limitations on the ability to reach/push/pull bilaterally in the upper extremities. (Tr. 499-501, 589, 593).

Moreover, while Plaintiff alleges the ALJ erred in limiting Plaintiff's upper extremity work restriction to unilateral, rather than bilateral, the record supports the ALJ's RFC determination of light work with occasional overhead reaching with the non-dominant (left)

hand. Specifically, the records show that Plaintiff was seen on June 2, 2015, at Boston Mountain Rural Health Center for complaints of pain in his left wrist from his accident the previous year. (Tr. 451). On June 15, 2015, Dr. Noel Henley noted that x-rays of the left wrist that day revealed no fracture, dislocation, or other abnormality or sign of acute injury. (Tr. 482). Plaintiff was diagnosed with possible carpal tunnel syndrome; he was instructed to wear a splint on the wrist; and he was advised to undergo nerve testing. (Tr. 483). Electrodiagnostic testing from June 22, 2015, was consistent with a diagnosis of left cervical radiculopathy at C6 and/or C7; left mild median neuropathy at the level of the wrist consistent with a diagnosis of carpal tunnel syndrome; and history and physical examination was also suggestive of possible cervical myelopathy. (Tr. 491). On July 23, 2015, Plaintiff saw Dr. John Barr with complaints of arm contractures and hand weakness, greater on the left than the right, worsening gait and balance, burning pain over entire left arm, and difficulty holding his left arm straight especially with intended motion. (Tr. 546). Soon thereafter, Plaintiff underwent a three-level anterior cervical discectomy and fusion procedure (ACDF). (Tr. 547). On August 27, 2015, at a post-operative follow-up, Dr. Barr noted that Plaintiff's left arm was no longer in the flexed position and had improved range of motion; he had improved strength; he had continued numbness, but his dysphagia was resolving; he denied significant neck pain; and he was healing well. (Tr. 544). On September 30, 2015, an x-ray of Plaintiff's cervical spine showed cervical spine fixation from C3 through C6 anteriorly with plate and screws and no hardware loosening or fracture. (Tr. 521).

On October 1, 2015, Plaintiff reported to Dr. Barr that he had recovered full function until two weeks prior when he was doing some heavy lifting and had a setback with muscle aches and pains in his biceps. (Tr. 541). Dr. Barr ordered an additional MRI of the cervical

spine and instructed him to refrain from heavy lifting. (Tr. 543). An October 9, 2015, MRI of the cervical spine showed interval ACDF of C3-6 with improved caliber of the spinal canal at these levels, particularly at the C4-5 and C5-6 levels; stable moderate to severe foraminal narrowing at C5-6 level; and stable T2 hyperintensity within the cord at the C4-5 andC5-6 levels compatible with gliosis. (Tr. 551). A November 10, 2015, x-ray of Plaintiff's cervical spine showed stable cervical spine with redemonstrations of anterior cervical disc fusion of C3 through C6 with hardware intact and stable alignment. (Tr. 520). On that day, Dr. Barr's notes indicated that since Plaintiff's neck procedure, his strength and sensation had improved; his dysphagia had improved; he was wearing his collar as instructed; his wound was healing well; and his arm, which had previously been in a flexed position, had also improved. (Tr. 538).

In addition, on January 19, 2016, when Plaintiff complained to Dr. Proffitt of left arm pain, an x-ray of Plaintiff's left humerus yielded normal results. (Tr. 584-585). On August 15, 2016, Dr. Barr completed a Physical Exertion Limitations Form describing Plaintiff's physical limitations to be that of light work, as well as a Physical RFC Assessment form, indicating that Plaintiff had significant limitations in the ability to reach/push/pull bilaterally in the upper extremities. (Tr. 593). On February 19, 2016, an x-ray of Plaintiff's cervical spine showed stable cervical spine fusion with anterior plate and screw fixation from C3-C6. (Tr. 158). On August 15, 2016, an x-ray of Plaintiff's cervical spine showed "stable anterior cervical fusion." (Tr. 31). That day, Dr. Barr noted that preoperatively, Plaintiff had profound left arm pain from a four-wheeler accident and that Plaintiff continued to have some left arm weakness and inability to open it fully, as well as neck pain. (Tr. 33). On September 12, 2016, a cervical spine CT showed postsurgical changes of anterior cervical discectomy and fusion procedure

from C3-C6, and persistent central canal stenosis and neural foraminal narrowing at C5-C6 and left-sided exit neural foraminal narrowing at C4-C5. (Tr. 28).

Moreover, while the ALJ considered the opinions of the non-examining state medical consultants, who found that Plaintiff's medical record supported a finding of light work with overhead reaching restrictions as of August 5, 2015, the record shows that the ALJ did not totally rely on those opinions, but rather gave them great weight. (Tr. 103).

Upon careful review of the record, the Court finds that there was substantial evidence to support the ALJ's RFC determination of light work with occasional overhead reaching with the non-dominant hand.

### E. Hypothetical Question to the Vocational Expert:

As for Plaintiff 's argument that the ALJ erred in his hypothetical to the vocational expert, Plaintiff reasserts many of the same arguments presented in the RFC Assessment section of his brief. After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments with the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005); see also Smith v. Colvin, 756 F.3d 621, 627 (8th Cir. 2014) (concluding that the ALJ properly phrased the hypothetical to the vocational expert, recognizing that a hypothetical need only include impairments that the ALJ finds credible). Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude him from performing work as a cashier, a marking clerk, and a routing clerk. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from

vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

**V.     Conclusion:**

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 3rd day of December, 2018.

/s/ *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE